IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KENNETH W. WILLIAMS,

     Plaintiff,

     v.                                     Case No. 2:17-CV-2310-HLT

CORECIVIC, INC., et al.,

     Defendants.

## MEMORANDUM AND ORDER

Plaintiff Kenneth Williams sued his former employer, Defendant CoreCivic, Inc., for race discrimination and harassment under 42 U.S.C. § 1981, and retaliation under Kansas common law and the False Claims Act. His claims arise from his termination in January 2017.

CoreCivic moves for summary judgment on all claims. Doc. 112. As discussed below, the Court finds that Williams has not demonstrated that the employment actions he complains of were taken because of his race, nor has he demonstrated that he engaged in protected conduct sufficient to state retaliation claims. Further, he has not demonstrated that the stated reason for his termination was a pretext for discrimination or retaliation, or that he was subjected to a racially hostile work environment. Accordingly, the Court grants CoreCivic's motion.

## I.    BACKGROUND

CoreCivic runs the Leavenworth Detention Center ("LDC") in Leavenworth, Kansas. Doc. 119 at 7. Williams, who is African American, worked as a shift supervisor (also referred to as a captain) at the LDC from April 4, 2011, until he was terminated on February 8, 2017. Doc. 111 at 2. As a shift supervisor, Williams reported to the chief of security, who reported to the assistant warden, who in turn reported to the warden. Doc. 119 at 8. The chief of security during the relevant period was Roger Moore, who is white. *Id.* at 15-16. The assistant warden was Dwight Fondren,

who is African American. *Id.* at 16. In 2016, Linda Thomas became warden at the LDC. *Id.* Thomas is African American. *Id.* Before that, the warden was Isaac Johnston, who is also African American. *Id.*

Williams has worked in the prison setting for 27 years, and, before Thomas became warden, he never filed any complaints for discrimination or retaliation and had an excellent employment record. Doc. 131-2 at 1.

### A. Williams's PSNs

#### 1. September 2015 PSN

Employee discipline at CoreCivic is documented on Employee Problem Solving Notices ("PSNs"). Doc. 119 at 11. In 2015, Williams received a PSN for allowing two correctional officers under his supervision to exceed a 16-hour work day. Doc. 119 at 18. Chief of Unit Management Kenneth Daugherty issued the 2015 PSN, and Fondren and Johnston approved it. *Id.* During that time, it was not uncommon for employees to exceed 16 hours in a work shift due to understaffing. Doc. 131-2 at 2. But no other shift supervisor was disciplined for allowing this, other than Williams. *Id.*

#### 2. January 2017 PSN

Williams was scheduled to complete some training on September 19-22, 2016. Doc. 119 at 21. On September 22, Williams arrived at work but told trainers that he had to leave for a previously scheduled appointment. *Id.* Fondren later spoke with Williams about his absence and asked him to provide a doctor's note. *Id.* at 21-22. Williams later acknowledged that he was aware of the training on those days, and that he never mentioned his doctor's appointment before arriving on September 22 because he intended to attend at least some of the training that day. *Id.* at 33.

Although a PSN was created around the time Williams missed the training, it was not served or issued to him at the time. *Id.* at 22-23. On November 8, 2016, Williams filed a grievance regarding the missed September training and alleged that he had been given a PSN in retaliation for various activities. *Id.* But the PSN for the September 22 absence was not finalized and served by Fondren until January 19, 2017. *Id.* at 24.

Williams later testified that he filed the November 8 grievance because he had learned that there was an outstanding PSN on his record, and he believed it prevented him from getting a promotion. *Id.* at 22-23. Williams could not recall the promotion he had missed out on, but it was "maybe" in Phoenix, or at the very least, in the state of Arizona. *Id.* at 23.

### 3. February 2017 Termination

CoreCivic operates the LDC under a contract with the United States Marshals Service ("USMS"), as well as other state and local government agencies. *Id.* at 9. CoreCivic's contract with the USMS requires CoreCivic to perform in accordance with various standards, including the Performance-Based Detention Standards. *Id.* at 9-10. One of those standards, A.10.7., sets forth 40 hours of management and supervision training for supervisors in their first year of employment, and 24 hours each year thereafter. Doc. 119 at 12-13; Doc. 113-5 at 6.

Failure to comply with the Performance-Based Detention Standards could result in a reduction of the contract price. Doc. 119 at 10. CoreCivic's contract with the USMS requires CoreCivic to "establish an overall written training program for all employees which incorporates, <u>at a minimum</u>, the training requirements set forth in the . . . Performance-Based Detention Standards." *Id.* at 11-12 (emphasis added). The CoreCivic Learning and Development Policy 4-1 states that management and supervisory staff are to receive at least 24 hours of management training each year after their first year, referencing Performance-Based Detention Standard A.10.7.

*Id.* at 13-14. In 2012, Williams also signed a document stating that "[r]equired training hours for those positions are specifically outlined in CCA[1] Policy 4-1" and that "unexcused absences for required training are causes for immediate separation of employment." *Id.* at 14.

The Learning and Development Manager at the LDC is Sandra Elliott. *Id.* at 21. On October 4, 2016, Elliott sent an email to Williams and another CoreCivic employee stating, "Due to scheduling issues, AW Fondren has directed that you be assigned the 24 hour supervisory training tract instead of attending the SFLL seminar. You can find these courses in LMS under Assigned Curriculums. . . . These classes need to be completed prior to December 1st. Let me know if you need anything." *Id.* at 36-37 (ellipses in original). This meant that Williams and the other employee would have to complete the 24 hours of supervisory training online instead of attending a training course in person. Williams did not respond to Elliott.[2] *Id.* The LMS system referenced in Elliott's email is available 24 hours a day, though Williams contends that employees were not expected to complete training courses at home or when they were not at work. *Id.* at 37. Online courses on LMS could also be paused and returned to at a later time. *Id.*

Elliott followed up with Williams on November 21, 2016, stating that "you have not completed any of your Supervisor training tract as notified on October 4th. The deadline to have these completed is December 1st – ***this is USMS audit required training and is not optional***.

---

[1] CCA, or Corrections Corporation of America, was CoreCivic's previous name. Doc. 113 at 6 n.1.

[2] Williams responds to this fact as "DISPUTED BUT IMMATERIAL" and states that he corresponded with Elliott as late as December 2016 "regarding attempting to complete the online training on his own before the end of the year." Doc. 119 at 37. In support, he cites "See Dep. Ex. 28." The Court has been unable to locate "Dep. Ex. 28" in Williams's exhibits, which are not very well organized. By not pointing to relevant portions of the record, Williams has failed to dispute this fact. *See* D. Kan. Rule 56.1(b)(1). The Court did locate a deposition exhibit 28 in CoreCivic's exhibits. Doc. 113-26 (CoreCivic Exhibit 37). But that exhibit does not reflect any correspondence between Elliott and Williams. Instead, it reflects emails between Moore and Williams on December 1, 2016, discussed *infra* in section I.A.3. To the extent this is the "Dep. Ex. 28" Williams refers to, it does not controvert the fact that Williams never responded to Elliott's email assigning him the online training.

Please get on this immediately." *Id.* at 37-38 (emphasis in original). Williams again did not respond.[3] *Id.* at 38.

On November 30, 2016, Moore emailed Williams and six other supervisors and reminded them that they needed to complete their online supervisor training by December 1. *Id.* at 38. In response, Williams and Moore had the following exchange:

> Moore: "As a reminder supervisors needs [sic] to complete their online supervisor training by December 1st. There is no exception there has been plenty of time given to complete it. In addition I believe Mr. Lawson still has some online training that needs completed."
>
> Williams: "Will be completed by end of the year."
>
> Moore: "The suspense date given is December 1st. It was sent out in October that is when it needs to be done by"
>
> Williams: "As discussed in your meeting on Tuesday and again tonight before you left for the day you asked when it will be completed."
>
> Moore: "Sir the e-mail makes it clear when it is due. I am done discussing this."
>
> Williams: "You are the one that requested at your meeting when it will on line computer work would be completed [sic]. Again before you left on Wednesday you asked me when it was going to be completed and I again I informed you of the completion date. It is you that followed up with an e-mail about the same issue."
>
> Moore: "Let me clarify this Training Manager Elliott put out a completion date of December 1st back in October. The email I sent out after the meeting on Tuesday was to reiterate the required completion date she set."
>
> Williams: "ok"

Doc. 113-26 (CoreCivic Exhibit 37); *see also* Doc. 119 at 38-40.[4]

---

[3] *See supra* note 2.

[4] Williams responds to this string of facts about the emails between him and Moore by disputing them in part, not disputing them in part, and also labeling them immaterial—despite the fact that his failure to complete the supervisor training was the stated reason for his termination. He cites again to "Dep. Ex. 28," which, as discussed above in note 2, the Court believes to be Doc. 113-26 (CoreCivic's Exhibit 37). That exhibit clearly shows that the

On December 28, 2016, Elliott emailed Williams and asked him to complete his required supervisor training before midnight on December 31, 2016, "as required." Doc. 119 at 42. Williams did not respond. *Id.* at 42-43.[5] As of January 1, 2017, Williams had only completed 6 of the 22 assigned supervisor training courses. *Id.* at 43. Of the 52 supervisors at the LDC, Williams was the only one who failed to complete the training.[6] *Id.* at 44-45. On January 3, 2017, Elliott told Moore and Thomas that Williams had failed to complete his supervisor training, and Williams was placed on administrative leave. *Id.* at 46-47.

CoreCivic subsequently investigated Williams's failure to complete the supervisor training. *Id.* at 47. During the investigation, Williams admitted he did not complete the training assigned by Elliott in October 2016. *Id.* at 48. On February 8, 2017, CoreCivic terminated Williams. *Id.*[7] Thomas made the decision based on Williams's failure to comply with the training requirements. *Id.* at 49.[8] Thomas was also aware of Williams's failure to respond to Elliott's emails about the training and his email exchange with Moore. *Id.* at 50.

### B. Williams's Complaints About LDC Management

Jason Ellis is the Managing Director of Operations for several CoreCivic facilities. *Id.* at 25. In September 2016, Williams emailed Ellis to set up a time to talk about staff safety and the

---

[ ] correspondence between Williams and Moore is as reflected in CoreCivic's statement of facts 129-136. *See* Doc. 119 at 38-40. Accordingly, Williams has come forward with no evidence actually disputing these statements of fact.

[5] Again, Williams cites to "Dep. Ex. 28" to dispute this fact. But as discussed above in note 2, that exhibit does not reflect any correspondence between Williams and Elliott. Williams also cites to "Audio" and Thomas's declaration. But the Court has not been provided with any audio recording, and Thomas's declaration does not controvert that Williams did not respond to Elliott's email. *See* 121-1 at 5 (¶¶ 21-23).

[6] Williams contends this is because he was the only one being discriminated and retaliated against and that his efforts to complete the training were sabotaged, but he does not otherwise dispute that he was the only one who failed to complete the training. *See* Doc. 119 at 44-45.

[7] CoreCivic also issued Williams a PSN on February 8, 2017, the day he was terminated, for moving an inmate without first investigating the safety of the move. Doc. 119 at 34-36.

[8] Williams argues this reason was pretext for retaliation but he does not dispute that his failure to complete the supervisor training was the <u>stated</u> reason for his termination. *See* Doc. 119 at 49-50.

facility "not using sound correctional practices." *Id.* At some point after that email, Williams and Ellis spoke by phone about "a gamut" of issues, including integrity, "unequal treatment of minorities and the diverse staff members," inmate safety, staff safety, discipline, shift assignment, and falsification of documents. *Id.* at 25-26.

On October 4, 2016, Ellis sent Thomas a list of concerns that had been raised to him, but he never identified Williams as the source of the concerns. *Id.* at 27-28. Although Ellis never identified Williams as the source of the complaints, Thomas suspected that Williams might have been the one who spoke to Ellis. *Id.* at 28-29. Williams again emailed Ellis on October 23, alleging retaliation by Thomas and that leadership at the LDC had gone "from bad to worse." *Id.* at 29. But Williams does not recall if he talked to Ellis again after that second email. *Id.*

At some point, Williams also discussed "unsafe conditions" at the LDC with someone named Lieutenant Elmer Grayson, though it is not clear where Grayson works or who he is affiliated with. *Id.* Grayson gave Williams a business card for someone with the Bureau of Prisons. *Id.* Sometime between September 2016 and December 2016, Williams contacted the BOP employee and spoke about unsafe conditions at the LDC. *Id.* at 29-30. Thomas was not aware that Williams spoke to anyone from BOP. *Id.* at 30.[9] Williams also claims he talked to USMS employees. Specifically, when Marshals came to drop off inmates, Williams claimed that "we would just be talking, I discussed items with them." *Id.* at 31. There is no evidence Thomas was aware of these conversations either. *Id.*[10]

---

[9] Williams disputes this fact by pointing to evidence regarding Thomas's suspicion that Williams talked to Ellis and her belief that he complained generally. But none of the cited exhibits suggest Thomas was aware of Williams's conversation with the unknown <u>BOP employee</u>. Thus, the evidence cited by Williams to controvert this claim fails to meet the substance of the matter asserted. *See* D. Kan. Rule 56.1(e). The Court again notes that one of the exhibits Williams cites to—an audio recording—has not been provided to the Court, and thus the Court has not considered it. *See* D. Kan. Rule 56.1(d).

[10] *See supra* note 9.

On October 24, 2016, Williams called the CoreCivic Ethics Hotline and complained about an unresolved grievance, denial of a leave request, and the unserved PSN (which was later served in January 2017). *Id.* at 32. He also alleged that he believed Thomas was retaliating against him for contacting Ellis. *Id.* Williams's allegations were investigated, but no evidence of retaliation was found. *Id.* at 33. Specifically, the actions that Williams challenged as retaliatory were determined to be legitimate and warranted management responses. *Id.* The investigation also concluded that, although Williams had alleged that several supervisors had conspired to retaliate against him, Williams provided no statements or corroborating evidence. *Id.* at 33-34.

## II.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To carry this burden, the nonmovant "may not rely merely on . . . its own pleadings." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (internal quotations and citations omitted). "Rather, it must come forward with facts supported by competent evidence." *Id.* The inquiry turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In applying this standard, courts must view the evidence and all reasonable inferences from it in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587.

## III.    ANALYSIS

Williams has alleged race discrimination and a racially hostile work environment under 42 U.S.C. § 1981, and retaliation under Kansas common law and the False Claims Act. Doc. 111 at 8. The parties dispute whether Williams has preserved a retaliation claim under § 1981. Each of these claims is discussed in turn.

### A.    Race Discrimination – 42 U.S.C. § 1981

Section 1981 prohibits race discrimination in the workplace. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015). The same standards apply in § 1981 cases as in cases brought under other anti-discrimination statues, including the *McDonnell Douglas* burden-shifting framework. *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1168 (10th Cir. 2018).[11]

Under this framework, Williams must first demonstrate a prima facie case of discrimination by establishing (1) he is a member of a protected class;[12] (2) he suffered an adverse employment action; and (3) that the circumstances give rise to an inference of discrimination. *See E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). If a plaintiff can make that showing, the burden shifts to the employer to give a legitimate, non-discriminatory reason for the employment decision. *Payan*, 905 F.3d at 1168.[13]

The burden then shifts back to the plaintiff to show that the stated reason is merely a pretext for discrimination. *Lounds*, 812 F.3d at 1221-22. A plaintiff may demonstrate pretext by pointing

---

[11]  Williams acknowledges that the *McDonnell Douglas* framework applies because there is no direct evidence of discrimination. Doc. 119 at 67-68.

[12]  The parties do not dispute that Williams is a member of a protected class.

[13]  CoreCivic argues that Williams's prima facie case requires him to show he was qualified for the position at issue, and that his failure to complete the supervisor training left him unqualified for his job. Doc. 113 at 27, 29-30. But Williams's failure to complete the training is the stated reason for his termination. CoreCivic cannot rely on it to defeat Williams's prima facie case. *See E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000) ("When an employee's failure to meet objective, employer-imposed criteria is one of the legitimate, non-discriminatory reasons advanced by an employer to dispel the inference of discrimination raised by an employee at the prima facie stage, it cannot also be used to defeat the employee's prima facie case.").

to facts that a factfinder could rely on to conclude that the stated reason for the adverse employment action is unworthy of belief. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). This can be done by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the stated reason. *PVNF*, 487 F.3d at 801 (quoting *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005)).

Williams bases his race discrimination claim on two employment actions: the 2015 PSN and his termination.[14] Each is discussed in turn under the standards outlined above.

### 1. 2015 PSN

The Court notes that Williams received at least three PSNs during his employment. He received the 2015 PSN for letting workers exceed 16 hours of work in a day. Doc. 119 at 18. He received a PSN for missing the September 22 training, which was allegedly started in September 2016 but not served until January 2017. *Id.* at 22-24. And he received a PSN on the day of his termination in February regarding an incident involving an inmate. *Id.* at 34-36. Although Williams argues generally that PSNs are adverse employment actions, he only alleges that one is the product of race discrimination: the 2015 PSN. *Id.* at 71-72.

An adverse action results in "a significant change in employment status," such as termination, failure to promote, or ineligibility for things like promotions. *Aquilino v. Univ. of Kan.*, 268 F.3d 930, 934 (10th Cir. 2001). What constitutes an adverse employment action is liberally construed in the Tenth Circuit, but the analysis is done on a case-by-case basis considering the unique factors of the particular situation. *Id.* An adverse employment action is generally one that has a significant impact on an employee's status. *See Budenz v. Sprint Spectrum, L.P.*, 230 F.

---

[14] Williams includes a statement in his brief that "placing [Williams] at increased risk of an attack by slandering him to inmates is also actionable." Doc. 119 at 70. But this is the extent of the argument. Because Williams does not support or expand on this allegation, the Court does not consider it.

Supp. 2d 1261, 1275 (D. Kan. 2002). This can extend to "decisions that have a demonstrable impact on future employment opportunities," "unjustified evaluations and reports," and "unfavorable letters of reference to prospective employers." *Id.*

But although an adverse employment action can be an action that harms future employment prospects, it does not extend to "acts that merely have a de minimis impact upon an employee's future job opportunities." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004) (noting that an employer's action must be materially adverse to an employee's prospects, but that materiality is not dependent on a tangible employment consequence). Although an employee does not have to demonstrate that, but for the action he would have gotten a new job, he must "show a likely effect on future job opportunities." *Id.* at 1029. De minimis impact is not enough. *Id.* at 1033. Likewise, "[s]peculative harm does not constitute adverse employment action." *Aquilino*, 268 F.3d at 936.

Here, CoreCivic has not disputed the general proposition that "PSNs affect an individual's ability to be promoted." Doc. 131-2 at 9.[15] But CoreCivic also argues that Williams's argument about not receiving promotions because of the 2015 PSN is speculative. The Court agrees on that point. That claim is based on Williams's own conclusory and unsupported testimony, and he could not even recall the name of the facility or the city where he applied. Doc. 119 at 22-23. Although Williams does not need to show that he would have gotten the job but for the PSN, he must at least show "a likely effect" on his job prospects. *Hillig*, 381 F.3d at 1029. He has not done so.

Additionally, Williams argues that it was the unserved PSN (later served in January 2017) that stopped him from getting a promotion. Doc. 119 at 22-23. But Williams has not put forward any evidence that the <u>2015 PSN</u>—the only one he argues was the result of race discrimination—

---

[15] Although CoreCivic does not specifically state that this fact is undisputed, CoreCivic has failed to dispute it, other than arguing generally that Williams's claim of missed promotional opportunities is speculative. Doc. 131-2 at 9. This fails to meet the substance of the asserted fact. *See* D. Kan. Rule 56.1(e).

prevented him from being considered for a promotion. Given this, the Court cannot conclude that a reasonable jury could find that the 2015 PSN had a "a demonstrable impact on future employment opportunities" for Williams, *see Budenz*, 230 F. Supp. 2d at 1275, or had a "likely effect on future job opportunities," *Hillig*, 381 F.3d at 1029. Notably, all Williams has asserted is that PSNs can affect future promotional opportunities. *See* Doc. 119 at 70. But the same can be true for any discipline meted out by an employer. Such speculative or de minimis harm is not sufficient to establish an adverse employment action.

Even if the Court were to consider the 2015 PSN an adverse employment action, the Court still concludes that Williams has not established a prima facie case of discrimination with regard to the 2015 PSN. Williams argues that the 2015 PSN was issued under circumstances that give rise to an inference of discrimination because white employees engaged in the same conduct and were not disciplined. Doc. 119 at 71-72. The Court notes that it is uncontroverted that, around the time Williams was issued the 2015 PSN, it was not uncommon for employees to exceed 16 hours in a work shift due to staffing issues, and that only Williams was disciplined for allowing this. Doc. 131-2 at 2. But that Williams was the only one who was punished for this conduct does not give rise to an inference of <u>race</u> discrimination because there are no allegations or facts showing that Williams was the only African American shift supervisor.

Further, even if white employees engaged in this conduct and were not punished, as Williams alleges, the Court notes that Williams has not come forward with evidence demonstrating that those white employees were similarly situated to him. "Individuals are considered 'similarly-situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'" *PVNF*, 487 F.3d at 801. Williams has not pointed to any evidence that the white employees he

identifies were similarly situated to him. Given this, the Court concludes that, even if the 2015 PSN was an adverse employment action, Williams has not demonstrated it was the result of race discrimination.[16]

### 2.    Termination

The parties do not dispute that Williams's termination constitutes an adverse employment action. Therefore, to establish his prima facie case of discrimination based on his termination, Williams must show that the circumstances give rise to an inference of discrimination. Williams argues his termination was the product of discrimination because Moore and Thomas treated African Americans poorly, Quinn referred to Williams as "boy, son, and sonny," and that Elliott made racially derogatory comments towards African Americans and failed to help him complete the online supervisor training. Doc. 119 at 72-73.

This is insufficient to raise an inference of discrimination. First, Quinn was not involved in the decision to terminate Williams, and thus his behavior is irrelevant. The same is true for Elliott. Although she sent the email regarding the training, she did not make the decision to terminate Williams. To the extent she "conducted no special training" for Williams, there is no allegation that Williams ever <u>requested</u> any special training or assistance. To the contrary, it is undisputed that Williams never even responded to Elliott's emails about the training. *Id.* at 37-38. And in his correspondence with Moore, he never asked for help but instead just stated he would do it on a different timeline than was set. *Id.* at 38-40. Finally, Williams's arguments that Moore

---

[16] Williams appears to rely on dissimilar treatment from his white coworkers to establish both a prima facie case of disparate treatment and pretext as to the 2015 PSN. Doc. 119 at 71-72, 75. Dissimilar treatment from similarly situated coworkers is more often used to show that a stated reason for an employment action was pretext for discrimination. *See E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 489 (10th Cir. 2006). Here, it is undisputed that the stated reason for the 2015 PSN was that Williams let workers work more than 16 hours in a day. Doc. 119 at 18. But for the same reason that Williams's argument on this point fail to give rise to an inference of discrimination—i.e., the lack of sufficient evidence of similarly situated coworkers who were treated more favorably—it likewise fails to show that this stated reason was pretext for discrimination.

and Thomas[17] mistreated African Americans is vague, circular, conclusory, and entirely subjective.[18] It is insufficient to show a causal link between his race and his termination.

Even assuming Williams could establish a prima facie case of discrimination regarding his termination based solely on Moore's and Thomas's alleged reputation for mistreating African Americans, CoreCivic has stated that Williams was fired because he failed to complete the supervisor online training. This is a legitimate, non-discriminatory reason, which shifts the burden back to Williams to establish that reason was merely pretext for discrimination. *See Lounds*, 812 F.3d at 1221-22. On this point, Williams's claim also fails.

As explained above, pretext requires evidence that the stated reason is unworthy of belief. *Kendrick*, 220 F.3d at 1230. Courts look for "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the stated reason. *PVNF*, 487 F.3d at 801. A plaintiff may also show pretext by demonstrating that he "was treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness, provided the similarly situated employee shares the same supervisor, is subject to the same performance standards, and otherwise faces comparable relevant employment circumstances." *BCI Coca-Cola*,

---

[17] The fact that Thomas is African American does not in and of itself mean that she could not harbor racial animus towards Williams, who is also African American. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) ("[I]n the related context of racial discrimination in the workplace we have rejected any conclusive presumption that an employer will not discriminate against members of his own race."); *see also Payan*, 905 F.3d at 1170. Williams also argues for application of the cat's paw theory of liability, seemingly in response to CoreCivic's argument that there can be no discrimination where the decisionmakers are the same race as Williams. Doc. 119 at 69, 73. The cat's paw theory of liability in employment-discrimination cases refers to situations where a biased subordinate who does not have the power to make an employment decision uses the actual decisionmaker "as a dupe in a deliberate scheme to trigger a discriminatory employment action." *BCI Coca-Cola*, 450 F.3d at 484. But that theory does not fit Williams's allegations. Williams specifically argues that Thomas, Moore, Quinn, and Elliott <u>all</u> bore racial animus towards African Americans, which led to his termination. In other words, under Williams's theory, there is no unwitting "dupe." The cat's paw theory is inapplicable.

[18] Specifically, Williams bases this contention on allegations that Moore was known to be "racist," and that others observed Thomas treating white employees more favorably than African Americans. Doc. 119 at 72-73. But these are little more than subjective conclusions. Elsewhere in his response, Williams alleges that Moore and Quinn texted each other that Williams and his African American attorney "stick together." *Id.* at 62. But as CoreCivic points out, the texts were sent years after Williams was terminated, and thus have no bearing on events that occurred leading up to his termination. Doc. 131-2 at 12-13.

450 F.3d at 489 (quoting *Green*, 420 F.3d at 1194) (internal quotations omitted). In a pretext analysis, courts look at the facts as they appear to the person making the decision. *Kendrick*, 220 F.3d at 1231.

Williams argues that his termination is pretextual for five reasons: (1) the training he failed to complete was not "mandatory;" (2) Elliott removed Williams from a training class and failed to perform one-on-one training sessions with him; (3) his termination was not warranted; (4) the 2015 PSN demonstrates that his supervisors "set out to discriminate against him;" and (5) Moore, Quinn, Elliott, and Thomas treated African Americans poorly or made racially derogatory statements. Doc. 119 at 73-75.

First, Williams argues that the training he failed to complete was not "mandatory." He bases this on the fact that a document titled Performance Based Standards for Adult Local Detention Facilities does not label the supervisor training he failed to complete as "mandatory." *Id.* at 73-74. Although it is true that document does not label the supervisor training as "mandatory," Williams does not address the undisputed fact that CoreCivic's contract with the USMS uses the Performance Based Standards as <u>minimum</u> training requirements, and that CoreCivic's policy, which Williams signed, specifically required supervisors to complete the 24 hours of supervisor training. *See* Doc. 131 at 5; Doc. 119 at 12-14. So, although the Performance Based Standards for Adult Local Detention Facilities does not deem the training "mandatory," CoreCivic clearly did. As noted above, whether the reason for termination is pretext is judged by the facts as they appeared to the person who made the decision, not the plaintiff. *Kendrick*, 220 F.3d at 1231; *United States ex rel. Coffman v. City of Leavenworth*, 303 F. Supp. 3d 1101, 1129 (D. Kan. 2018). Here, it is undisputed that Moore and Elliott both told Williams that he was required to complete the training, and he failed to do so. Even Fondren, who Williams says

"confirmed" that the training was not mandatory, testified that it was still "required," even if not "mandatory." Doc. 125 at 71-73.

Second, Williams argues that Elliott removed him from "the training" and then failed to provide "special training" with him to ensure he completed it. But Williams misstates the evidence. It is undisputed that Elliott sent an email to Williams and another employee stating that Fondren had determined they should complete their training through the online program instead of through a course. Doc. 119 at 36-37. Williams has pointed to no facts that Elliott prevented Williams from completing the <u>online</u> training. And it is undisputed that Williams never <u>asked</u> for assistance in completing the online training. That Williams was not offered "special training," especially where he never even asked for it, does not demonstrate pretext.

Third, Williams argues that CoreCivic has set forth no evidence that terminating him "was warranted." Doc. 119 at 74. But, to the contrary, CoreCivic has stated that he was terminated because he failed to complete the assigned training. Williams's opinion that he should not have been fired as a result does not demonstrate pretext. Williams's disagreement notwithstanding, "[a] company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct." *Kendrick*, 220 F.3d at 1233. Likewise, Williams's argument that Fondren testified that "there's a process" and that employees are not <u>usually</u> fired for one or two incidents is not sufficient to cast doubt on CoreCivic's decision. *See* Doc. 119 at 74. Although "evidence that the defendant acted contrary to a written company policy" or "contrary to an unwritten policy or contrary to company practice" can demonstrate pretext, *see Kendrick*, 220 F.3d at 1230, Williams has not pointed to any written policy that CoreCivic violated. The only unwritten policy or practice reference is Fondren's vague testimony that "there's a process." Doc. 119 at 74; Doc. 121-6 at 10-11. But Williams does not expound on what that process

is or how it was not followed in his case. *See Kendrick*, 220 F.3d at 1230 ("A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness."). Further, Fondren's testimony made clear that, although termination is not automatic where an employee fails to complete required training, it would depend on the circumstances. Doc. 121-6 at 10-11. Here, Williams was assigned the online training in October, told to complete it by December 1, unilaterally decided he would complete it by December 31 instead, and then failed to do even that. The Court notes that it is undisputed that Williams was the only one of 52 shift supervisors who failed to complete the 24 hours of supervisor training. Doc. 119 at 44-45. Given this, the Court cannot conclude (nor could a reasonable jury) that Fondren's testimony establishes that CoreCivic acted contrary to its policies when it terminated Williams as a result, or that the reason for Williams's termination is unworthy of belief or a pretext for discrimination.

Fourth, Williams argues that his termination was pretext for discrimination because the 2015 PSN demonstrates that his supervisors "set out to discriminate against him." Doc. 119 at 75. But Williams has not established that the 2015 PSN was discriminatory. And it is undisputed that the 2015 PSN was issued and approved by Daughtry, Fondren, and Johnston—three individuals who were not involved in the decision to terminate Williams. *See id.* at 18. Accordingly, the 2015 PSN in no way demonstrates that Williams's termination over a year later for different conduct was pretext for discrimination.

Fifth, Williams again argues that Moore, Quinn, Elliott, and Thomas either had a history of treating African Americans poorly, or else made racially derogatory statements. But as

discussed above, these arguments are vague and conclusory and do not otherwise demonstrate that the stated reason for Williams's termination is unworthy of belief.

Accordingly, Williams has not come forward with any evidence of pretext. CoreCivic is therefore entitled to summary judgment on Williams's claim of race discrimination under § 1981.

**B.      Hostile Work Environment – 42 U.S.C. § 1981**

Section 1981 also permits a plaintiff to bring a claim for a racially hostile work environment. *Lounds*, 812 F.3d at 1221. To establish a hostile work environment, a plaintiff must show (1) he is a member of a protected class, (2) he was subjected to harassment, (3) the harassment was based on race, and (4) the severity or pervasiveness of the harassment altered a term, condition, or privilege of employment and created an abusive working environment. *Id.* at 1222; *see also Payan*, 905 F.3d at 1170. "[T]o avoid summary judgment at the prima facie stage, a plaintiff must present evidence that creates a genuine dispute of material fact as to whether 'the workplace is permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Lounds*, 812 F.3d at 1222 (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007)).

Anti-discrimination laws do "not establish a general civility code for the workplace." *Id.* (quoting *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012)). Accordingly, the work environment must be both objectively and subjectively hostile. *Id.* at 1222-23; *Payan*, 905 F.3d at 1171. "[I]t is not enough that a particular plaintiff deems the work environment hostile; it must also be of the character that it would be deemed hostile by a reasonable employee under the same or similar circumstances." *Lounds*, 812 F.3d at 1222.

Williams argues he was subjected to a racially hostile work environment in the following ways: (1) he was issued the 2015 PSN while other white employees were not disciplined for similar

conduct; (2) Moore treated African Americans "poorly"; (3) Quinn referred to Williams as "boy, son, and sonny," even though Williams was almost 60 years old; (4) Williams reported discriminatory conduct by Moore and Quinn but his complaints were not investigated; (5) Elliott made racially derogatory comments about African Americans and did not conduct special training for Williams; (6) Thomas treated white employees more favorably than African American employees; and (7) Williams was blamed and disciplined for a fight between inmates, made to do his training online, and then fired for not completing it. Doc. 119 at 78-80.

Based on this, Williams has failed to establish a prima facie case of hostile work environment because he has failed to point to evidence of racial harassment so severe or pervasive that it altered the terms of his employment or created an abusive working environment. In particular, his allegations that Moore treated African Americans "poorly" and that Thomas treated white employees more favorably are entirely subjective, to say nothing of conclusory, which is not sufficient to survive summary judgment on this claim. *See Lounds*, 812 F.3d at 1222-23. Equally vague is Williams's allegation that he reported Moore and Quinn for discriminatory conduct and that it was not investigated. Nor has Williams established that the discipline he received, including his termination, was because of his race. *See supra* section III.A. And as discussed above, there is no evidence that Williams ever requested any special training or assistance in completing the training that he was assigned. Therefore, Elliott's failure to spontaneously schedule a special training session just for Williams is not indicative of a hostile work environment.

That leaves Williams's allegations that Quinn referred to him as "boy, son, and sonny," and that Elliott made racially derogatory statements.[19] Even accepting these allegations as true,

---

[19] Williams alleges that Elliott remarked about not voting for a black president and that having a black warden leave the LDC would cause increased stress for black employees. Doc. 131-2 at 20. But there are no allegations that Elliott made any such statements to Williams.

with all inferences drawn in Williams's favor—and even assuming the alleged comments were racially motivated—these "few isolated incidents of racial enmity" are not sufficient to establish a hostile work environment. *Lounds*, 812 F.3d at 1223 (quoting *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998)). "Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Id.* (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)). Williams has not alleged any facts rising to that level. Accordingly, CoreCivic is entitled to summary judgment on Williams's racially hostile work environment claim.

### C.     Retaliation – Kansas Common Law

Kansas is historically an at-will employment state, meaning that employers can typically fire employees at any time and for any reason. *Campbell v. Husky Hogs, L.L.C.*, 255 P.3d 1, 3-4 (Kan. 2011). But there are exceptions, including for whistleblowing. Specifically, Kansas allows the "common-law tort of retaliatory discharge . . . when it is necessary to protect a strongly held state public policy from being undermined." *Id.* at 5; *Heckman v. Zurich Holding Co. of America*, 2007 WL 677607, at *4 (D. Kan. 2007).

To assert a claim for retaliatory discharge based on whistleblowing, "an employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare." *Palmer v. Brown*, 752 P.2d 685, 690 (Kan. 1988). The employer must know of the employee's reporting such violation before termination and must have made the termination decision in retaliation for the report. *Id.* Finally, the whistleblowing must have been done out of a good faith concern and not for a malicious purpose. *Id.*

Retaliatory discharge claims under Kansas law are analyzed under the same *McDonnell Douglas* burden-shifting framework that applies to federal employment claims. *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002). That is, Williams must establish a prima facie case of retaliatory discharge (as outlined above), and if CoreCivic can articulate a legitimate, non-discriminatory reason for his termination, Williams must point to specific facts that create a triable issue as to whether the stated reason is a pretext for retaliation. *Id.* at 1194.

Williams gives relatively short shrift to his initial burden of proving a prima facie case of retaliatory discharge under Kansas law. He simply asserts that he complained about conduct at the LDC that "is illegal under Kansas law," citing K.S.A. § 44-636(a), including "safety issues, staff being assaulted, and many other unsound correctional practices," "unsafe conditions at Leavenworth," and "the falsification of documents and 'a gamut of issues at the facility.'" Doc. 119 at 82-83. And then he was fired three months later. *Id.*

The Court finds that Williams has failed to establish a prima facie case of retaliatory discharge. To overcome summary judgment, Williams must point to facts that demonstrate that "a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare," and that CoreCivic knew he was reporting such violations. *Palmer*, 752 P.2d at 690. But Williams has not pointed to any specific conduct of CoreCivic that would constitute a violation of a rule, regulation, or law pertaining to public health, safety, or the general welfare.

Instead, he merely alleges that he spoke to certain individuals about "safety issues" or "unsound correctional practices" or "a gamut of issues" that are "illegal under Kansas law."[20] But

---

[20] The Kansas law Williams cites to is K.S.A. § 44-636(a). That provision allows the secretary of labor to enter "any factory or mill, workshop, private works, public works or state agency or institution, mercantile establishment,

none of those facts specifically identify any misconduct of CoreCivic. *See Diebold v. Sprint/United Mgmt. Co.*, 2002 WL 1071923, at *3-*4 (D. Kan. 2002) (noting that whistleblowing cases require plaintiffs to "clearly identif[y] the action which allegedly violated the law and precipitated the whistleblowing" and dismissing the plaintiff's complaint because it did "not identify which action (or failure to act) caused her to believe that Sprint's conduct was unlawful"); *Palmer v. Pentair*, 2019 WL 3239350, at *8 (D. Kan. 2019) (noting that a retaliatory discharge claim for violation of public policy "requires plaintiff to clearly allege a violation of specific and definite rules, regulations, or laws beyond a mere feeling of wrongdoing"); *Goodman v. Wesley Med. Ctr., L.L.C.*, 78 P.3d 817, 822-23 (Kan. 2003) ("It would be both troublesome and unsettling to the state of the law if we were to allow a retaliatory discharge claim to be based on a personal opinion of wrongdoing.").[21]

Most of these facts cited by Williams reflect only his vague and generalized complaints about operation of the LDC. *See* Doc. 119 at 26-34 (for example, noting that he and Ellis discussed discipline, shift assignments, promotions, the "treatment in general" of minorities, the integrity of the company "not being followed," and safety concerns). But he offers nothing concrete to show that the conduct he complained about was based on more than his own opinion of wrongdoing. *See Goodman*, 78 P.3d at 822-23.

---

laundry or any other place of business where labor is or is intended to be performed for any purpose . . . to examine into the methods of protection from danger to employees and the sanitary conditions in and around such buildings and places and to keep a record thereof of such inspection." K.S.A. § 44-636(a). If certain safety or unsanitary conditions are found, the secretary will notify the owner in writing and may order corrective measures. *Id.* Although this provision may permit the secretary of labor to order corrective measures for certain conduct, it does not necessarily establish the illegality of any particular conduct.

[21] CoreCivic initially raised this as a deficiency in an earlier motion to dismiss, and that argument was rejected because Williams had included enough allegations in the complaint about CoreCivic's objectionable conduct to plausibly state a common law retaliatory discharge claim. Doc. 50 at 5-7. But that order noted that "though more specificity about safety violations would be helpful to identify the issues, that is a matter is best left for discovery." *Id.* at 7. Despite this, Williams's arguments seem to have gotten more vague instead of more specific.

His most specific allegations were that inmates with conflicts were being placed in the same unit, that an inmate assaulted an officer, and that "the logs of supervisors making rounds and stuff was not accurately accounted for." Doc. 119 at 26-27. But these allegations are still highly generalized and do not establish a violation of any rule, regulation, or law pertaining to public health, safety, or the general welfare that would warrant submission of his retaliatory discharge claim to a jury.[22]

Even if Williams had shown a prima facie case of retaliatory discharge under Kansas law, his case would still fail because CoreCivic has asserted a legitimate, non-discriminatory reason for his termination—that he failed to complete his assigned supervisor training—and Williams has failed to demonstrate that this explanation was a pretext for retaliation. Williams's arguments that his termination was a pretext for retaliation are largely the same as they are in his discrimination claim—that the training was not "mandatory," that Elliott did not help him complete the training, and that his termination was "not warranted." For the same reasons discussed above, those arguments do not demonstrate pretext.

Williams does add the argument that the timing of his termination is suspect because it occurred in January 2017 following his complaints in September and October 2016.[23] Doc. 119 at 77. Temporal proximity is one factor that can lead to a finding of pretext, but it is not enough standing alone. *Lounds*, 812 F.3d at 1236 n.10. Unless the proximity is very close, it must be combined with other evidence to suggest that the stated reason for the adverse employment action

---

[22] Likewise, Williams's complaint to the CoreCivic Ethics Hotline about an unresolved grievance and denial of a time-off request do not establish a violation of any rule, regulation, or law pertaining to public health, safety, or the general welfare. *See* Doc. 119 at 32.

[23] Williams talked to Ellis sometime before October 4, 2016. He was not placed on administrative leave until January 3, 2017—three months later. The date of William's other complaints is not provided, except his October 24, 2016 call to the CoreCivic Ethics hotline, which as noted in note 22, was not about any rule, regulation, or law pertaining to public health, safety, or the general welfare.

is unworthy of belief. *Id.*; *see also Hysten v. Burlington N. Santa Fe Ry. Co.*, 296 F.3d 1177, 1183-84 (10th Cir. 2002) (noting that a three-month period between the protected conduct and termination is not sufficient to raise an inference of retaliation). Here, Williams has no other evidence that the stated reason for his termination is unworthy of belief. Given that, the few months between his complaint and his termination is insufficient, standing alone, to demonstrate that the reason for his termination was pretext for retaliation.

> ### D.      Retaliation – False Claims Act, 31 U.S.C. § 3730

Williams asserts a retaliation claim under the False Claims Act ("FCA"). Doc. 111 at 8. The FCA creates civil liability for anyone who knowingly presents false claims to the United States for payments, or who makes a false statement material to a false claim for payment. *See generally* 31 U.S.C. §§ 3729-3733. The United States can bring a suit on its own under the FCA, or a private person (known as a relator or a whistleblower) may sue on behalf of the United States in what is known in a qui tam action. *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 736 (10th Cir. 2019); *see also*  31 U.S.C. § 3730(a)-(b). To protect relators and whistleblowers, the FCA has an anti-retaliation provision. *See* 31 U.S.C. § 3730(h). That provision protects anyone who takes actions "in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." *Id.*

To state a claim for retaliation under the FCA, a plaintiff must prove that "(1) she engaged in protected activity, (2) the defendant 'had been put on notice' of that protected activity, and (3) the defendant retaliated against the plaintiff 'because of' that activity." *KeyPoint Gov't Sols.*, 923 F.3d at 764 (quoting *McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 704 (10th Cir. 2012)). "Protected activity" for purposes of the FCA means "employees who take steps 'in furtherance of' either a qui tam claim or 'other efforts to stop 1 or more violations' of the [FCA]." *Id.* at 738

(quoting 31 U.S.C. § 3730(h)(1)). Thus, although a person does not need to pursue a qui tam action or be part of a government-initiated case, they must be acting to stop a violation of the FCA. *See id.* at 765 ("[W]histleblowers who lawfully try to stop one or more violations of the Act are protected, without regard to whether their conduct advances a private or government lawsuit under the Act.").

Williams claims that he has established a prima facie case of retaliation under the FCA because he complained to Ellis "about safety issues, staff being assaulted, and many other unsound correctional practices" as well as "the falsification of documents²⁴ and 'a gamut of issues at the facility.'" Doc. 119 at 80. But the FCA's retaliation provision is not a generic law against retaliation. It is specific to the FCA. The protected activity must have some nexus to that law. *See KeyPoint Gov't Sols.*, 923 F.3d at 767. Williams has not shown that his generic complaints reflect any action "'in furtherance of' either a qui tam claim or 'other efforts to stop 1 or more violations' of the [FCA]." *Id.* at 738 (quoting 31 U.S.C. § 3730(h)(1)). Accordingly, there is no genuine issue of material fact that could establish a prima facie claim of retaliation under the FCA.²⁵ CoreCivic is entitled to summary judgment on this claim.²⁶

---

²⁴ Williams testified at his deposition that "falsification of documents" was one of the "gamut of issues" that he discussed with Ellis. Doc. 119 at 25-26. But there are no factual allegations about what this refers to, nor is there any allegation that any falsified document was related to a false claim for payment from the United States.

²⁵ Obviously, if Williams did not engage in protected activity under the FCA, his supervisors could not have been on notice of the same. Likewise, although the Tenth Circuit does not appear to have directly addressed the issue, several circuit courts, as well as some cases in the District of Kansas, have held that the *McDonnell Douglas* framework applies in FCA retaliation cases. *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012) ("The *McDonnell Douglas* approach fits comfortably with the test that courts generally apply to retaliation claims under section 3730(h)(1)."); *United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1241 (D.C. Cir. 2012) (noting that the First Circuit applies the *McDonnell Douglas* framework to FCA retaliation claims and adopting that approach); *Coffman*, 303 F. Supp. 3d at 1122 (applying *McDonnell Douglas* test to FCA retaliation claim); *McCurdy v. Cowley Cty. Developmental Servs., Inc.*, 2014 WL 298680, at *1 (D. Kan. 2014) (same). Therefore, even if Williams could point to facts establishing a prima face case of FCA retaliation, his claim would still fail under the pretext analysis as discussed throughout.

²⁶ CoreCivic alternatively argues that Williams's retaliatory discharge claim under Kansas law is precluded by his retaliation claim under the FCA. Doc. 113 at 46-47; *see also Coffman*, 303 F. Supp. 3d at 1130 (stating that a common law claim is precluded where there are "adequate alternative remedies" that redress the same harm). But as discussed above, CoreCivic also argues—correctly—that Williams's FCA retaliation claim fails because

### E.  Retaliation – 42 U.S.C. § 1981

Finally, the parties dispute whether Williams has preserved a retaliation claim under § 1981. In the pretrial order, Williams lists his legal claims as:

1. Race discrimination in violation of 42 U.S.C. § 1981.

2. Racial harassment (hostile work environment) in violation of 42 U.S.C. § 1981.

3. Retaliatory discharge in violation of Kansas common law.

4. Retaliation under the False Claims Act, 31 U.S.C. § 3729 et seq.

Doc. 111 at 8. He did not list a retaliation claim under § 1981. CoreCivic did not address a § 1981 retaliation claim in its motion because it was not included in the pretrial order and CoreCivic believes it was waived. Doc. 131 at 10-12. But in response to the summary-judgment motion, Williams states that the pretrial order lists § 1981 as the governing law of the case and contends that he "reported discriminatory conduct, harassment, hostile work environment" and other issues and was retaliated against as a result. According to Williams, therefore, CoreCivic was on notice that Williams was asserting a § 1981 retaliation claim. Doc. 119 at 76 n.2. The Court disagrees.

The only retaliation claims Williams specifically listed in the pretrial order are claims under Kansas common law and the FCA. He omitted any retaliation claim under § 1981. Doc. 111 at 8. The pretrial order does state that § 1981 governs this case, but it also states that Kansas common law and the FCA apply as well. *Id.* at 2. Generic <u>factual</u> allegations of retaliation do not put CoreCivic on notice that there is an additional § 1981 retaliation claim at issue, especially where

---

Williams has not alleged that he pursued any FCA violations, which would mean that he does not have an adequate alternative remedy in the FCA. Regardless, the Court has found that Williams has not come forward with facts to establish a prima face case of retaliation under either Kansas common law or the FCA, and even if he had, he has not demonstrated that the stated reason for his termination was pretextual. Thus, the Court need not decide whether his FCA retaliation claim precludes his state law claim.

other retaliation claims under Kansas common law and the FCA were specifically listed under Williams's legal claims and a § 1981 retaliation claim was not.

The pretrial order controls the scope of this case. *Id.* at 1 ("This pretrial order supersedes all pleadings and controls the subsequent course of this case."). Claims and allegations not included in the pretrial order are waived and are no longer part of this case. *See Koch v. Koch Indus., Inc.*, 179 F.R.D. 591, 596 (D. Kan. 1998). Because Williams did not assert a § 1981 retaliation claim in the pretrial order, he has waived that claim.

Even if Williams had preserved a § 1981 retaliation claim, however, the claim would still fail because his arguments about pretext are the same as in his § 1981 discrimination claim and his retaliatory discharge claim under Kansas law. *See supra* sections III.A. and III.C. The Court has already concluded that Williams has not demonstrated a causal connection between any protected activity and his termination, and he has not demonstrated that the stated reason for his termination was pretext. A § 1981 retaliation claim would likewise fail for the same reasons.

## IV.    CONCLUSION

THE COURT THEREFORE ORDERS that CoreCivic's Motion for Summary Judgment (Doc. 112) is GRANTED. Judgment is to be entered for CoreCivic.

IT IS SO ORDERED.

Dated: December 31, 2019                    /s/ *Holly L. Teeter*
                                            HOLLY L. TEETER
                                            UNITED STATES DISTRICT JUDGE